■ In the Matter of ELLIS CENTER FOR LONG TERM CARE et al., Respondents-Appellants, v BARBARA DeBUONO, as Commissioner of Health of the State of New York, et al., Appellants-Respondents. [694 NYS2d 177] —Mikoll, J. Cross appeals from a judgment and two amended judgments of the Supreme Court (Ceresia, Jr., J.), entered February 13, 1998, March 4, 1998 and March 13, 1998 in Albany County, which partially granted petitioners' application, in a proceeding pursuant to CPLR article 78, to, *inter alia*, direct respondent Commissioner of Health to recalculate petitioners' Medicaid reimbursement rates and to reimburse petitioners for any amounts owed to them by reason of the recalculation.

This matter comprises four separate CPLR article 78 proceedings challenging respondents' implementation of Public Health Law § 2808 (14), enacted to reduce State Medicaid expenditures by limiting administrative and fiscal costs of nursing homes for the period April 1, 1995 through March 31, 1996. Petitioners are owners and operators of 10 free-standing and five hospital-based not-for-profit residential health care facilities aggrieved by the calculation of their Medicaid reimbursement rates in consequence of this enactment by respondent Department of Health (hereinafter DOH).

The statute reads, in pertinent part, as follows: "for purposes of establishing rates of payment by governmental agencies for residential health care facilities for services provided on or after April [1, 1995] through March [31, 1996], *the reimbursable base year administrative services and fiscal services costs, as defined in the New York state residential health care facility accounting and reporting manual, of a residential health care facility, excluding a provider of services * * * shall not exceed the statewide average of total reimbursable base year administrative and fiscal services costs of residential health care facilities.* For the purposes of this subdivision, reimbursable base year

administrative and fiscal services costs shall mean those base year administrative and fiscal services costs remaining after application of all other efficiency standards, including but not limited to, peer group cost ceilings or guidelines. The limitation on reimbursement for provider administrative and general expenses provided by this subdivision shall be expressed as a percentage reduction of the operating cost component of the rate promulgated by the commissioner for each residential health care facility" (Public Health Law § 2808 [14] [emphasis supplied]).

It is not disputed that this section, one of several cost-containment measures adopted in conjunction with the State's 1995-1996 budget, was designed to curtail expenditures in an area of nursing home operations deemed prone to excess spending. Despite its relatively straightforward language and intent, application of Public Health Law § 2808 (14) involves a multitude of calculations before its ultimate purpose is served. In this proceeding, petitioners claim that DOH utilized a flawed methodology in implementing the statute's directive. Supreme Court rejected all but one of petitioners' claims, detailed *infra*, prompting their appeal. Respondents appeal from that portion of Supreme Court's order directing the recalculation of petitioners' Medicaid reimbursement rates.

Petitioners' first objection to respondents' implementation of Public Health Law § 2808 (14) relates to the method used by DOH to ascertain the "statewide average of total reimbursable base year administrative and fiscal services costs of residential health care facilities". Rather than computing and expressing the State-wide average of reimbursable base year administrative and fiscal services (hereinafter A&F) costs as a dollar amount, DOH elected to calculate and express these costs as a percentage of total reimbursable operating costs statewide, arriving at a ratio of 9%. DOH then calculated each facility's percentage of A&F costs to its total operating costs and if the ratio exceeded the State-wide average of 9%, it commensurately reduced the operating cost component of that facility's reimbursement rate. Petitioners argue that this method conflicts with the plain language of the statute and results in an unfair negative impact upon their individual reimbursement rates. Supreme Court found, and we agree, that petitioners' argument demonstrates only that there is an alternative method of calculating the State-wide average of such costs which may prove more favorable to them, but they have not established that DOH's method was irrational, unreasonable or inconsistent with the statute's purpose (*see, Matter*

*of Memorial Hosp. v Axelrod*, 68 NY2d 958, 960; *see also, Matter of Jennings v New York State Off. of Mental Health*, 90 NY2d 227, 239).

Petitioners' next, and least persuasive, argument urges that the 9% A&F cap should not have been applied to reduce the total "operating costs" component of their reimbursement rate, since included within that component is reimbursement for direct, indirect and noncomparable costs directly related to patient care. As the statute itself explicitly provides that "[t]he limitation on reimbursement for provider administrative and general expenses provided by this subdivision shall be expressed *as a percentage reduction of the operating cost component* of the rate promulgated by the commissioner [of health] for each residential health care facility" (Public Health Law § 2808 [14] [emphasis supplied]), Supreme Court properly rejected this portion of petitioners' argument.

Petitioners successfully argued before Supreme Court that in utilizing the ratio method of calculating their A&F costs, DOH improperly omitted certain adjustments which would have increased their total operating costs, thereby reducing the ratio of their A&F costs thereto. In failing to make these adjustments, petitioners argued that DOH did not comply with that portion of the statute providing that "[f]or the purposes of this subdivision, reimbursable base year [A&F] costs shall mean those base year [A&F] costs remaining *after application of all other efficiency standards, including but not limited to, peer group cost ceilings or guidelines*" (Public Health Law § 2808 [14] [emphasis supplied]). Specifically, petitioners urged, and Supreme Court concluded, that rate adjustments for "case mix" and "bed conversions", both affecting total operating costs, were required. For the reasons which follow, we believe that Supreme Court erroneously concluded that these two adjustments were mandated.

A facility's Medicaid reimbursement rate is comprised of four components: direct, indirect, noncomparable, and capital costs.[1] The first three categories (direct, indirect and noncomparable) are collectively referred to as "operating costs". The "operating cost" component of the rate is calculated with reference to actual costs reported by a facility in a base period (1983). After a facility's actual reported costs are reviewed to exclude any "non-allowable" costs, DOH makes various adjustments to the direct and indirect cost portions to reflect, *inter alia,* changes in its actual patient treatment costs, regional wage differences,

---

1. *See*, 10 NYCRR 86-2.10 *et seq.*

the size of the facility and inflation. The end product of this complex process is the facility's per diem reimbursement rate.

Among the adjustments made by DOH to a facility's base year costs are a case mix adjustment and bed conversion factor. The case mix adjustment measures change between the base year and the rate year for purposes of adjusting reimbursement of direct costs associated with patient care. While we appreciate that a facility's case mix adjustment affects its total operating costs, it does so insofar as it measures the change between a facility's patient experience in the base year and rate year for purposes of identifying changes in, and reimbursement for, its direct care costs (*see, Matter of Teresian House Nursing Home Co. v Chassin*, 218 AD2d 250, 252). Similarly, a facility's bed conversion factor, designed to eliminate the distinction between a "skilled nursing facility" and a "health-related facility", is an adjustment made to reflect changes between the facility's proportion of SNF and HRF beds in its base year and the proportion thereof as of September 30, 1990 (*see,* 10 NYCRR 86-2.10 [t]; *Matter of Amsterdam Nursing Home Corp. v Commissioner of N. Y. State Dept. of Health*, 192 AD2d 945, *lv denied* 82 NY2d 654). As the statute clearly requires calculation of the A&F cap with reference to reimbursable "base year" costs, i.e., those costs reported for the year 1983, we believe that DOH rationally interpreted the statute as requiring, or at the very least justifying, their exclusion.

Moreover, in reviewing rate-setting actions, which are quasi-legislative in nature, we will intervene only " 'upon a compelling showing that the calculations from which [they] derived were unreasonable' " (*Matter of Society of N. Y. Hosp. v Axelrod*, 70 NY2d 467, 473, quoting *Matter of Catholic Med. Ctr. v Department of Health*, 48 NY2d 967, 968). An agency's interpretation of a statute is entitled to considerable deference by a reviewing court particularly where, as here, the interpretation also implicates the agency's highly technical knowledge and understanding of complex operational procedures and practices (*see, Matter of Home Care Assn. v Bane*, 218 AD2d 106, 109, *lv denied* 87 NY2d 808).

Petitioners' remaining contentions do not warrant extended discussion. DOH's implementation of Public Health Law § 2808 (14) violated neither Public Health Law § 2803 (2) (a) (ii), directing the State Hospital Review and Planning Council to promulgate regulations where necessary to effectuate the provisions of Public Health Law article 28, nor the State Administrative Procedure Act § 202 *et seq.*, requiring that certain procedures be followed in promulgating administrative rules.

Public Health Law § 2808 (14) directs the imposition of cap on A&F costs and specifies the manner in which it should be ascertained and applied. DOH responded by revising its reimbursement rate computation to comport with this directive. When the purpose of the statute is specific, it is unnecessary for an agency to promulgate formal rules or regulations as long as the intent of the statute is effected (*see, O'Neil v Metropolitan Tr. Auth.*, 143 AD2d 739, 740, *appeal dismissed* 74 NY2d 909; *see also, Matter of Home Care Assn. v Bane, supra*).

Finally, we reject petitioners' contention that respondents violated the procedural requirements of the Boren Amendment[2] by, *inter alia*, implementing the State plan amendment without first securing approval from the Federal Health Care Financing Administration. As Supreme Court properly held, absent a specific finding of disapproval, a State may implement a change in its State plan pending Health Care Financing Administration approval (*see, Washington State Health Facilities Assn. v State of Washington*, 879 F2d 677, 682; *Colorado Health Care Assn. v Colorado Dept. of Social Servs.*, 842 F2d 1158, 1166).

Cardona, P. J., Yesawich Jr., Spain and Graffeo, JJ., concur. Ordered that the judgment and amended judgments are modified, on the law, without costs, by reversing so much thereof as partially granted petitioners' application by directing respondent Commissioner of Health to recalculate petitioners' Medicaid reimbursement rates and to reimburse petitioners for any amounts owed to them by reason of the recalculation, and, as so modified, affirmed. [*See,* 175 Misc 2d 443.]

---

**2.** Prior to August 1997, Medicaid rates for nursing homes were subject to the procedural and substantive requirements of 42 USC § 1396a (a) (13) (former [A]) (the Boren Amendment), requiring that Medicaid rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities". These standards were eliminated for payments subsequent to October 1997 to afford States greater flexibility in the development of payment methodologies.