■ In the Matter of EDWARD T. SYLCOX, JR., Doing Business as SYLCOX HEALTH CARE FACILITIES, et al., Appellants, v BARBARA A. DEBUONO, as Commissioner of Health of the State of New York, et al., Respondents. (And Three Other Related Proceedings.) [701 NYS2d 164] —Mercure, J. Appeal from a judgment of the Supreme Court (Teresi, J.), entered October 5, 1998 in Albany County, which dismissed petitioners' applications, in four proceedings pursuant to CPLR article 78, to review determinations of respondent Commissioner of Health setting petitioners' Medicaid reimbursement rates for the years 1995, 1996, 1997 and 1998.

Sylcox Health Care Facilities and petitioner Walnut Mountain Care Center (hereinafter collectively referred to as petitioners) are nursing homes participating in the Federal Medicaid program. Each operated a combined health-related facility (hereinafter HRF) and skilled nursing facility (hereinafter SNF) prior to Congress' enactment of the Omnibus Budget Reconciliation Act of 1987 (Pub L 100-203 [hereinafter OBRA 1987]) which mandated, among other things, that States eliminate regulatory and payment distinctions based on level of care (see, Matter of Amsterdam Nursing Home Corp. v Commissioner of New York State Dept. of Health, 192 AD2d 945, lv denied 82 NY2d 654). In response to OBRA 1987, respondent Commissioner of Health amended the applicable regulations so

---

as to eliminate the distinction between HRFs and SNFs and altered the reimbursement methodology accordingly. The Department of Health (hereinafter DOH) thereafter issued petitioners new operating certificates eliminating the SNF/HRF distinction and characterizing all of their beds as nursing facility beds.

In these consolidated proceedings, petitioners challenge their Medicaid reimbursement rates for 1995 through 1998 as arbitrary and capricious. All of petitioners' claims of error are grounded upon a single essential assertion, i.e., that DOH eliminated the distinction between HRF and SNF facilities by simply elevating all HRF residents to the more demanding and expensive SNF level of care, thereby entitling petitioners to the former SNF reimbursement rate for all of their patients, regardless of the level of care that the patients actually required or that was provided to them. Because we conclude that this basic premise underlying the petitions is lacking in legal or factual support, we affirm Supreme Court's judgment dismissing the petitions.

"A petitioner attempting to challenge the reasonableness of rate-setting action bears the burden of demonstrating that the adopted methodology is without a rational basis" (*Matter of Patterson SNF v Chassin*, 196 AD2d 155, 159, *appeal dismissed and lv denied* 83 NY2d 962; *see, New York State Assn. of Counties v Axelrod*, 78 NY2d 158, 166). Because agency rate-setting action is quasi-legislative in nature, the courts will intervene only upon a compelling showing that the calculations are unreasonable (*see, Matter of Ellis Ctr. v DeBuono*, 261 AD2d 791, 794; *see also, Matter of Consolation Nursing Home v Commissioner of N. Y. State Dept. of Health*, 85 NY2d 326, 331). In our view, petitioners' showing falls far short of that standard.

As correctly contended by respondents, petitioners' claim that all of its HRF beds were transformed into SNF beds in 1990 is a fallacy. OBRA 1987 did not require, and the Commissioner's regulations did not effect, any such transformation. Similarly, what petitioners claim to have been a reduction of their reimbursement rates following the enactment of OBRA 1987 is shown to consist of nothing more than the differential between the rates actually paid to petitioners and a hypothetical higher rate that they claim they should have been paid for 1995 through 1998 based upon the scenario they have crafted, i.e., that all of their patients are SNF patients and petitioners should therefore be reimbursed at the SNF rates in existence prior to October 1, 1990.

Our review of the record discloses that petitioners primarily

rely upon a single sentence of a July 22, 1998 affidavit of Carl Dembrosky, Director of the Bureau of Long Term Care within DOH's Division of Health Care Financing, to support their claim of transformation of all of their HRF beds to SNF beds: "The immediate effect [of the promulgation of uniform regulations applicable to all residential health care facilities] was to require former HRFs to meet the minimum nursing supervision requirement imposed on former SNFs, that is, that the facility utilize the services of [a Registered Nurse] for at least eight consecutive hours a day, seven days a week." Notably, the following sentence of the Dembrosky affidavit states: "Because petitioners operated both SNF and HRF levels of care prior to October 1, 1990, they already had sufficient staff to meet the new regulatory requirements." Review of the applicable regulations shows the latter statement to be correct (compare, 10 NYCRR 415.13 [a] [2], with 10 NYCRR former 416.2 [b]). Only freestanding HRF facilities required expanded registered nurse coverage, and those facilities received a rate adjustment effective October 1, 1990 to defray the increased cost. We also note that increased administrative burdens placed on facilities in completing patient assessments have been accommodated by means of a provision for an additional per diem adjustment (see, 10 NYCRR 86-2.10 [u]).

Contrary to petitioners' contentions, we conclude that the current methodology reasonably permits increases in direct and, ultimately, indirect reimbursement on the basis of changes in a facility's case mix index (hereinafter CMI)* (see, Matter of Ellis Ctr. v DeBuono, supra, at 180-181; Matter of Teresian House Nursing Home Co. v Chassin, 218 AD2d 250, 252; Matter of Patterson SNF v Chassin, supra, at 158-161) and that Supreme Court did not err in dismissing petitioners' applications.

Petitioners' remaining contentions have been considered and found to be lacking in merit.

Mikoll, J. P., Crew III, Yesawich Jr. and Mugglin, JJ., concur. Ordered that the judgment is affirmed, without costs.

---

* Each patient in a facility is evaluated and placed in one of 16 resource utilization groups, which reflect the level of care that must be provided the patient based upon such factors as the need for assistance with ambulation, eating and toileting, skilled nursing services, rehabilitation therapies and supervision. The CMI is the numeric weight assigned each category and reflects the relative resource utilization of patients in the group based upon the relative costs associated with patient care for the group. A facility's CMI is the weighted average of the CMIs of the resource utilization group categories for all its residents at any given time (see, 10 NYCRR 86-2.10 [a] [5]).