MORNING VIEW CARE CENTER–FULTON, Appellant,

v.

OHIO DEPARTMENT OF HUMAN SERVICES et al., Appellees.

[Cite as *Morning View Care Center–Fulton v. Ohio Dept. of Human Serv.*, 148 Ohio App.3d 518, 2002-Ohio-2878.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 01AP–931.

Decided June 6, 2002.

Geoffrey E. Webster, for appellant.

Betty D. Montgomery, Attorney General, and Rebecca L. Thomas, Assistant Attorney General, for appellees.

PETREE, Judge.

{¶ 1} Plaintiff-appellant, Morning View Care Center–Fulton ("MVCC–Fulton"), appeals from a judgment of the Franklin County Court of Common Pleas in favor of defendants-appellees, the Ohio Department of Human Services (now the Ohio Department of Job and Family Services), Jacqueline Romer–Sensky (former director), and Barbara Edwards (a deputy director), in their respective official capacities (collectively "ODJFS"). A judgment entry dated August 3, 2001, incorporated the trial court's written decision granting summary judgment to ODJFS and dismissing MVCC–Fulton's complaint for declaratory and injunctive relief in connection with the handling by ODJFS of its application for a Medicaid reimbursement rate adjustment as provided in R.C. Chapter 5111 and Ohio Adm.Code Chapter 5101:3.

{¶ 2} MVCC–Fulton is an intermediate care facility for the mentally retarded located in Morrow County and licensed by the state of Ohio. It is among several such facilities in the state owned by a common management group, Morning View Care Centers, operated by Dearth Management, Inc. MVCC–Fulton's 33 beds are certified to participate in federal Medicaid programs administered by ODJFS. MVCC–Fulton and ODJFS have been parties to a series of provider agreements

entered into pursuant to R.C. 5111.22. For a number of years prior to 1998, MVCC–Fulton was a 65–bed facility, similarly licensed and certified.

{¶ 3} This case involves financial circumstances related to MVCC–Fulton's effort to downsize the capacity of its principal facility and to develop four 8–bed group homes to which former residents of the 65–bed home were transferred as each new building became ready for occupancy. The Ohio Department of Mental Retardation and Developmental Disabilities ("ODMRDD") initially approved the development request in September 1993. The process of constructing the smaller group homes and transferring residents took place during calendar years 1996 and 1997,[1] but licensing changes were not effective until June 1, 1998. Annual provider agreements from September 1, 1995 through August 31, 1998 (extended to October 31, 1998) identified MVCC–Fulton's certification as a 65–bed intermediate care facility. More recent agreements indicate a certification for 33 beds.

{¶ 4} The request for rate reconsideration, which pertains only to the main facility, was dated December 29, 1998, and was expressly grounded in "extreme hardship" under R.C. 5111.29(A)(3) and Ohio Adm.Code 5101:3–3–24(D). The application pointed primarily to costs related to the downsizing effort that exceeded reimbursements in two cost centers and capital and indirect costs as contributing to the hardship. MVCC–Fulton represented that the reduction in capacity to 33 beds was part of a statewide program of ODMRDD to downsize larger intermediate care facilities for the mentally retarded and that the reduction in number of residents at the main facility was a main cause of its hardship.

{¶ 5} MVCC–Fulton suggested that fixed capital costs such as depreciation, amortization, interest expenses, and leasing costs for both real estate and equipment remained constant after the transfer of beds and, thus, caused an increase in the per diem cost per bed that was not adequately addressed by the reimbursements paid during fiscal years 1998 (July 1, 1997 to June 30, 1998) and 1999 (July 1, 1998 to June 30, 1999). MVCC–Fulton asserted that in spite of its aggressive attempts to reduce indirect costs, the size of the main facility and the continuing needs of its residents rendered it unable, during the period for which the rate adjustment was sought, to achieve a reduction proportionate to the number of beds eliminated as the result of the downsizing. Disparity between those costs and the reimbursements received during that period caused additional financial hardship according to the application for relief. MVCC–Fulton acknowledged that the expenditures allocated to capital and indirect costs exceeded the cost ceilings then in effect for those categories.

---

1. The first group home was opened June 24, 1996, and the others began operations on May 19, September 11, and November 26, 1997, respectively.

{¶ 6} In support of its request, MVCC–Fulton cited such improvements in the quality of life of its residents that resulted from the downsizing as an upgrading of common areas, a conversion from two-resident rooms to private rooms, and the creation of a less institutional environment. Those improvements did not require structural changes to the building. A letter from the outgoing[2] director of ODMRDD accompanied the application for rate reconsideration. The letter confirmed those benefits and encouraged ODJFS to grant the request based upon extreme hardship. (January 10, 2001 Depositions Ex. 1.)[3] MVCC–Fulton also furnished the documentation required by Ohio Adm.Code 5101:3–3–24(D)(3), including a three-month cost report.

{¶ 7} ODJFS reviewed the documentation and then requested additional information to explain certain issues the department identified within the initial request. The agency asked for clarification of the time period for which relief due to extreme hardship was being sought and confirmation of the facility's 1998 calendar year resident census. The department also asked for the following: (1) a copy of an operational plan detailing steps taken to prepare for downsizing; (2) a copy of a transition/downsizing budget; (3) a clearer explanation of the relationship between home office costs and the downsizing effort; (4) more detailed staffing information for both the main facility and the new group homes; (5) drawings of the facilities showing changes in usage and associated costs on a square-foot basis; (6) copies of lease agreements, depreciation schedules, and bank statements reflecting interest expense and principal debt; (7) more precise explanation of the figures presented under certain specific accounting codes; (8) copies of budgets for the 1998 and 1999 fiscal years; and (9) any other pertinent documentation reflecting the hardship.

{¶ 8} MVCC–Fulton responded in detail and specifically asked for an adjusted rate of $173.95 per patient per day based on the information included in its three-month cost report. A rate of $146.45 per patient per day was actually in effect during the same period. The total request was for approximately $734,354 in additional reimbursements for the two fiscal years addressed. After receiving this March 1, 1999 response to its request for additional information, ODJFS not only reviewed the financial data furnished but also performed its own calculations

---

2. A transition in gubernatorial administrations as well as departmental leadership occurred during the winter months of 1998–1999.

3. Depositions of ODJFS employees Harry Saxe, Barbara Edwards, Frank Blair, Susie Weber, and Kevin Carter were conducted on January 10 and 11, 2001. Transcripts of those and later depositions were properly filed in the record during June 2001. Exhibits referred to as "January 10, 2001 Deposition Ex. __" were marked and identified on that date, then referred to in a number of the depositions conducted throughout the discovery proceedings in the trial court.

where discrepancies were perceived in an attempt to relate increased costs to the downsizing exclusive of other factors.

{¶ 9} Based upon this analysis of all cost centers and a recalculation of allowable bed days during calendar year 1997, the period upon which the original rate for fiscal 1999 was determined, ODJFS granted a rate increase of $12.48 per diem, retroactively effective July 1, 1998. The approved adjustment amounted to a total increased reimbursement of approximately $222,456 for fiscal 1999 only. Relief for fiscal 1998 was denied because the application was deemed not timely for that year.

{¶ 10} Over the signature of Director Romer–Sensky, ODJFS issued a 15–page report, with attachments, explaining the decision to grant a lesser adjustment than had been requested. Relying upon the language in Ohio Adm.Code 5101:3–3–24(D)(1) that "a request for a rate reconsideration due to extreme hardship must be filed before the end of the fiscal year for which the rate is paid," ODJFS denied relief for fiscal year 1998 because the request for that year "should have been submitted * * * on or before June 30, 1998." (January 10, 2001 Depositions Ex. 4, at 2.) The director discussed standards ODJFS applied in reaching a decision regarding relief for fiscal year 1999. She specifically identified the necessity for a provider to demonstrate what circumstances are outside its control or a failure in the PPS (Prospective Payment System), and to document all the cost reduction steps implemented, along with the cost savings associated with those steps. (January 10, 2001 Depositions Ex. 4, at 14.) The director also emphasized the inability of the department to verify the representation by MVCC–Fulton that downsizing of its main facility was mandated. (January 10, 2001 Depositions Ex. 4, at 5.)

{¶ 11} MVCC–Fulton requested that the department reconsider its decision to grant partial relief only. MVCC–Fulton argued that where a rate adjustment is requested on grounds of extreme hardship, the department has the discretion to grant reasonable and appropriate reimbursement of the added costs of downsizing without regard to whether a government mandate or circumstances beyond the provider's control precipitate the hardship. Under that standard, the provider argued that an adjustment in the full amount requested is justified. ODJFS did not revise its initial award. MVCC–Fulton then filed its complaint in the Franklin County Common Pleas Court instituting the action from which this appeal is taken.

{¶ 12} MVCC–Fulton sought both declaratory and injunctive relief as to alleged violations by ODJFS of it rights under the Fifth and Fourteenth Amendments to the United States Constitution; Sections 1396 and 1983, Title 42, U.S.Code; Sections 1 and 2, Article I, Ohio Constitution; R.C. 5111.01 et seq.; and the provider agreements between the parties. MVCC–Fulton specifically

complained that although it had accomplished its downsizing in a reasonable, cost-effective and efficient manner to the benefit of its residents, ODJFS, with knowledge of the downsizing effort and having acquiesced in the reduction in number of beds, failed to reimburse adequate and reasonable costs for the period extending from July 1, 1997 to June 30, 1999. MVCC–Fulton contended that ODJFS failed to act in conformity with state and federal law when it recognized the need for a rate adjustment but failed to adjust the rate of reimbursement to an adequate and reasonable level in response to the increase in costs related to the downsizing.

{¶ 13} On September 14, 2000, the trial court dismissed several of those claims pursuant to Civ.R. 12(B)(6) [4] on the motion of ODJFS. The disposition of the motion to dismiss is not subject of this appeal. The court later granted summary judgment in favor of ODJFS on the remaining claims. In deciding the motion for summary judgment, the court held that ODJFS was entitled to judgment as a matter of law on MVCC–Fulton's due process and Section 1983, Title 42, U.S.Code claims because MVCC–Fulton could not prove that it possessed a protected property interest in a higher Medicaid reimbursement rate than that it received after ODJFS's partial granting of the reconsideration request. The court also noted that for purposes of a Section 1983, Title 42, U.S.Code action, the department is not a "person" as contemplated under that statute.

{¶ 14} The trial court found with respect to the state-law claims for an adjustment to the rate paid during fiscal 1998 that MVCC–Fulton did not request relief in a timely fashion and, therefore, ODJFS was entitled to judgment as a matter of law on any hardship alleged to have been experienced during that period. Finally, while recognizing that Ohio Adm.Code 5101:3–3–24(D) permits reimbursement of costs in excess of established rate ceilings under circumstances amounting to extreme hardship, the court determined that ODJFS did not abuse its discretion by granting an adjustment less than that asked for by MVCC–Fulton in the portion of the request attributable to fiscal year 1999. In reaching this conclusion, the trial court referred to what it termed the "unequivocal" discretion with regard to extreme hardship adjustments conferred upon the department by R.C. 5211.29 and adopted the position that " 'reasonable costs' are by definition those costs that fall within the ceilings set by R.C. 5111.20 to 5111.32 * * *." The court concluded that ODJFS was entitled to judgment as a matter of

---

4. The trial court granted the motion to dismiss as to the equal protection claims of MVCC–Fulton under the United States and Ohio Constitutions and as to the Section 1396(a), Title 42, U.S.Code statutory claims alleged under Section 1983, Title 42, U.S.Code. The court denied the motion to dismiss with respect to the procedural and substantive due process claims brought under Section 1983, Title 42, U.S.Code as well as the R.C. Chapter 5111 state law claims.

law on the claims that it violated R.C. 5111.21 by not fully reimbursing the reasonable costs MVCC–Fulton alleged it had incurred and would incur between July 1, 1998 and June 30, 1999.

{¶ 15} Appealing from that adverse judgment, MVCC–Fulton presents a single assignment of error for this court's consideration:

{¶ 16} "The trial court erred in granting summary judgment in favor of appellees and against appellant when there remained genuine issues of material fact and movants were not otherwise entitled to judgment as a matter of law."

{¶ 17} For the reasons that follow, we affirm the trial court's judgment as to the due process claims brought by MVCC–Fulton pursuant to Section 1983, Title 42, U.S.Code, and as to the claims for relief under state law that relate to fiscal 1998. As to the claims for relief under state law for fiscal 1999, however, we find that MVCC–Fulton produced evidence in opposition to the motion for summary judgment sufficient, when viewed most favorably to it as the nonmoving party, to establish the existence of genuine issues of material fact to be litigated. We, therefore, reverse the trial court's judgment in the latter respect.

{¶ 18} The Medicaid program is a source of federal funding designed to supplement state reimbursement to providers of medical and long-term care services to the poor. *Wilder v. Virginia Hosp. Assn.* (1990), 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455. The administration of the program is left to the individual participating states according to a federally approved plan that includes provision for reimbursement to service providers on a reasonable cost-related basis. *Ohio Academy of Nursing Homes, Inc. v. Creasy* (Aug. 16, 1983), Franklin App. No. 83AP–47, 1983 WL 3652; and *State ex rel. Shady Acres Nursing Home, Inc. v. Rhodes* (Dec. 23, 1982), Franklin App. No. 82AP–352, 1982 WL 4596.

{¶ 19} Ohio has a prospective cost-related system of reimbursement under which the annual costs for services in the calendar year ending prior to the effective date of a current rate are utilized to calculate that rate. *Ohio Academy of Nursing Homes, Inc. v. Creasy,* supra. In this case, for example, the rate of reimbursement paid to MVCC–Fulton during fiscal 1998 was based upon its cost reports for calendar 1996, and the rate for fiscal 1999 was calculated from calendar 1997 cost reports. Absent one or more of the circumstances mentioned in R.C. 5111.29 that permit a request for rate reconsideration, a provider cannot expect additional payments should its actual costs exceed the rate set for the current year. Instead, those increased costs will serve as the foundation for a higher rate of reimbursement in later years. Id.

{¶ 20}  R.C. 5111.21(A) provides in substance, as it has since originally enacted,[5] that "the department of job and family services shall pay * * * the reasonable costs of services provided to an eligible medicaid recipient by an eligible nursing facility or intermediate care facility for the mentally retarded." See, also, *Worthington Nursing Home, Inc. v. Creasy* (1982), 4 Ohio App.3d 92, 97, 4 OBR 174, 446 N.E.2d 841.  For the purposes of R.C. 5111.20 to 5111.32 and of Ohio Adm.Code 5101:3-3:

{¶ 21}  " 'Reasonable' means that a cost is an actual cost that is appropriate and helpful to develop and maintain the operation of patient care facilities and activities, including normal standby costs, and that does not exceed what a prudent buyer pays for a given item or services.  Reasonable costs may vary from provider to provider and from time to time for the same provider."  R.C. 5111.20(U) and Ohio Adm.Code 5101:3-3-01(AA).

{¶ 22}  The Ohio General Assembly has provided a procedure by which a facility may seek reconsideration of its Medicaid reimbursement rate, but has vested the responsibility to adopt specific rules for establishment of the process to ODJFS.  R.C. 5111.29(A).  Among the directives to ODJFS, with respect to rate reconsideration, R.C. 5111.29(A)(3) provides:

{¶ 23}  "The rules shall provide that the department, through the rate reconsideration process, may increase a facility's rate as calculated under sections 5111.23 to 5111.28 of the Revised Code if the department, in its sole discretion, determines that the rate as calculated under those sections works an extreme hardship on the facility."

{¶ 24}  The department's decision at the conclusion of the reconsideration process is not subject to any administrative proceedings under Ohio Adm.Code Chapter 119 or any other provision of the Revised Code.  R.C. 5111.29(A)(5).

{¶ 25}  As the legislature directed, ODJFS adopted Ohio Adm.Code 5101:3-3-24(D) pursuant to which a Medicaid provider may apply for a rate adjustment due to extreme hardship.  The rule allows for an increase of the provider facility's rate if the department, in its sole discretion, determines that the calculated rate works an extreme hardship on the facility.  A rate adjustment shall, if sought on those grounds, "be granted only once for a particular circumstance to a particular facility."  Ohio Adm.Code 5101:3-3-24(D).  "A request for rate reconsideration due to extreme hardship must be filed before the end of the fiscal year for which the rate is paid."  Ohio Adm.Code 5101:3-3-

---

**5.**  Beginning in 1980 there have been five versions of R.C. 5111.21(A) with effective dates, respectively, of July 1, 1980, December 23, 1986, November 14, 1989, December 13, 1990, and July 1, 2000.  The quoted language, except for the name of the agency, has been the same in all five versions.

24(D)(1). One of three conditions must exist for a request for rate reconsideration due to extreme hardship to have merit: (1) a prior request for relief due to extreme circumstances [6] has been denied; (2) the basis for the request is specifically not eligible for relief due to extreme circumstances; or (3) "the facility can demonstrate that the request for rate reconsideration due to extreme circumstances would be denied because it already has costs equal to or exceeding the ceiling in the cost center at issue." Ohio Adm.Code 5101:3–3–24(D)(2)(c).

{¶ 26} The request, in writing, must give a detailed explanation as to why a rate adjustment due to extreme hardship is warranted, including steps taken to address the circumstances outside the rate reconsideration process. Ohio Adm. Code 5101:3–3–24(D)(3)(a) and (d). A three-month cost report, as described in the rule, must accompany the request. Ohio Adm.Code 5101:3–3–24(D)(3)(e). Justification for a rate adjustment in excess of applicable ceilings must be provided in writing. Ohio Adm.Code 5101:3–3–24(D)(4). The effective date of any rate adjustment granted shall be determined by the sole discretion of the department. Ohio Adm.Code 5101:3–3–24(D)(5).

{¶ 27} When an appellate court reviews a case that was concluded at the trial level by summary judgment, it does so de novo, applying the same standards as required of the trial court. *Ryberg v. Allstate Ins. Co.* (2001), Franklin App. No. 00AP–1243, 2001 WL 777121. The review must be undertaken independently and without deference to the lower court's determination. *Al–Najjar v. R & S Imports, Inc.* (Aug. 29, 2000), Franklin App. No. 99AP–1391, 2000 WL 1220741. Where the decision as to whether the trial court properly granted summary judgment involves only questions of law, a reviewing court has complete and independent authority. *Am. Motorists Ins. Co. v. Olin Hunt Specialty Prod., Inc.* (Sept. 20, 2001), Franklin App. No. 00AP–1313, 2001 WL 1098013, citing *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241.

{¶ 28} Summary judgment is appropriate pursuant to Civ.R. 56 where (1) no genuine issue of material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) when the evidence is viewed most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, a conclusion adverse to the nonmoving party. *Ryberg, supra,*

---

**6.** Rate reconsiderations because of "extreme circumstances" differ from those due to "extreme hardship" and are addressed by R.C. 5111.29(A)(2) and Ohio Adm.Code 5101:3–3–24(C). "Extreme circumstances" are factors beyond the facility's control. Ohio Adm.Code 5101:3–3–24(C)(1). Any rate reconsideration due to "extreme circumstances" shall not increase a rate in excess of any established rate limitations or maximum rates. Ohio Adm.Code 5101:3–3–24(C)(4). The facility must not have efficiency incentives and equity payments included in the prospective rate that cover the cost increase, and costs in excess of ceilings will not be considered in the determination of available efficiency incentives. Ohio Adm.Code 5101:3–3–24(C)(3)(a).

citing *Tokles & Son, Inc. v. Midwestern Indemn. Co.* (1992), 65 Ohio St.3d 621, 629, 605 N.E.2d 936.

{¶ 29} The trial court correctly ruled that ODJFS, as an agency, is not a "person" subject to suit under Section 1983, Title 42, U.S.Code. This court previously held that one of the elements of a Section 1983 claim is that the conduct in controversy must be committed by a person acting under color of state law and that the state is not a "person" for purposes of Section 1983. *Mankins v. Paxton* (2001), 142 Ohio App.3d 1, 10, 753 N.E.2d 918. We agree that the departmental defendant-appellee is entitled to judgment as a matter of law on claims brought pursuant to Section 1983, Title 42, U.S.Code and alleged against it as an agency of the state of Ohio. We affirm the trial court's judgment on that issue.

{¶ 30} To show that the former director and the deputy director of ODJFS violated its due process rights and that it is entitled to relief under Section 1983, Title 42, U.S.Code, MVCC–Fulton must identify a constitutionally protected property right in a higher adjusted rate than has been granted by ODJFS. That property interest must be based on a legitimate claim of entitlement, created not by the Constitution, but instead by existing rules or understandings from an independent source such as state law that secures certain benefits and that supports claims of entitlement to those benefits. *Drake Ctr., Inc. v. Ohio Dept. of Human Serv.* (1998), 125 Ohio App.3d 678, 701, 709 N.E.2d 532, quoting *Bd. of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. If state law, including administrative rules, retains for the government a significant discretionary authority over the granting of a benefit, a lack of entitlement in a constitutional sense is indicated. *Drake Ctr.,* quoting *Senape v. Constantino* (C.A.2, 1991), 936 F.2d 687, 690.

{¶ 31} To justify relief on grounds of procedural due process, MVCC–Fulton must establish not only a legitimate property interest, but also that it was deprived of that interest without a meaningful opportunity to be heard. *Ohio Academy of Nursing Homes, Inc. v. Barry* (1990), 56 Ohio St.3d 120, 125, 564 N.E.2d 686, citing *Cooperman v. Univ. Surgical Assoc., Inc.* (1987), 32 Ohio St.3d 191, 199–200, 513 N.E.2d 288. In *Drake Ctr.,* supra, at 692–693, 709 N.E.2d 532, this court held that Ohio Adm.Code 5101:3–3–24(A) and (D) both provide opportunities to be heard that comply with the federal requirement that "[t]he Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates." Section 447.253(e), Title 42, C.F.R. A natural extension of that decision is that the procedure by which a provider may seek a

rate adjustment pursuant to Ohio Adm.Code 5101:3–3–24 constitutes a "meaningful opportunity to be heard" for procedural due process purposes as well.

{¶ 32} The essence of substantive due process is the protection from certain arbitrary, wrongful governmental actions irrespective of the fairness of the procedures used to implement them. *S. Health Facilities, Inc. v. Somani* (Dec. 29, 1995), Franklin App. No. 95APE06–826, 1995 WL 765161. Generally, rules promulgated by an administrative agency have the force and effect of law unless they are unreasonable or are in conflict with related statutes enacted by the General Assembly. *Ohio Academy of Nursing Homes, Inc. v. Barry*, supra, 56 Ohio St.3d at 127, 564 N.E.2d 686. They must have a reasonable relation to a proper legislative purpose and must not be arbitrary or discriminatory in their effect. Id. To satisfy substantive due process requirements, an administrative agency must interpret its own rules and apply them in a fashion that is neither arbitrary nor capricious. See *Oswalt v. Ohio Adult Parole Auth.* (Oct. 4, 2001), Franklin App. No. 01AP–363, 2001 WL 1167789. Still, a party alleging that a public official has violated its rights to substantive due process must establish a legitimate claim of entitlement to a constitutionally protected property interest.

{¶ 33} The Ohio Supreme Court has determined that a licensed Medicaid provider has a legitimate property interest in the reimbursement rate provided for it under R.C. 5111.21 and 5111.22, and that its interest may "not be diminished absent due process of law." *Ohio Academy of Nursing Homes, Inc. v. Barry*, supra, 56 Ohio St.3d at 126–127, 564 N.E.2d 686. The question squarely presented by this appeal is whether MVCC–Fulton likewise has a legitimate property interest in an increased rate pursuant to the rate reconsideration provisions of R.C. 5111.29.

{¶ 34} As was true in *Drake Ctr.*, MVCC–Fulton does not challenge the state's reimbursement system as a whole. Id., 125 Ohio App.3d at 687–689, 709 N.E.2d 532. Drake Center sought an adjustment in its reimbursement rate pursuant to R.C. 5111.257 and Ohio Adm.Code 5105:3–3–25 based upon the contention that it was entitled to additional compensation as a provider of "outlier" services.[7] Id. at 683, 709 N.E.2d 532. This court decided that R.C. 5111.257 does not create a mandatory duty on the agency's part to recognize all facilities requesting rate reimbursement under that statute as qualified providers

---

7. "Outlier" means residents who have special care needs as defined under rule 5101:3–3–25 of the Ohio Administrative Code. Ohio Adm.Code 5101:3–3–01(S). "Outlier services" are those clusters of services which have been determined by ODJFS to require staffing ratios, certain indirect costs, and capital investments beyond the levels otherwise addressed in rules 5101:3–3–43 and 5101:3–3–78 of the Ohio Administrative Code when delivered by qualified providers to individuals who have been prior authorized for the receipt of a category of service identified as an outlier service by ODJFS and/or set forth as such in Chapter 5101:3–3 of the Ohio Administrative Code. Ohio Adm.Code 5101:3–3–25(B)(2).

of outlier services. Instead, we observed that the "rulemaking function under the statute involves the exercise of agency discretion in determining whether there are facilities that serve residents whose diagnoses or needs are not measured adequately * * *." Id. at 695, 709 N.E.2d 532. Our conclusion in the *Drake Ctr.* appeal was that the provider failed to show it had a protected property interest in additional reimbursement as a provider of outlier services. Id. at 701, 709 N.E.2d 532.

{¶ 35}  We find no compelling reason to distinguish MVCC–Fulton's substantive due process claims from those of Drake Center. R.C. 5111.29(A)(3) vests ODJFS with considerable discretion and does not create a mandatory duty on the agency's part. R.C. 5111.257 provides in part that "[t]he rules may require that a facility that qualifies for a rate adjustment under this division receive authorization from the department to admit or retain a resident who qualifies the facility for the rate adjustment * * *." While the criteria for an adjustment pursuant to R.C. 5111.257 differs from the showing required by R.C. 5111.29(A)(3), the relief provided by both statutes is nonetheless an adjustment to the originally calculated rate for the subject facility. MVCC–Fulton, as a provider seeking additional reimbursement due to extreme hardship, does not have a constitutionally protected property interest in the adjusted reimbursement rate it seeks. Without a valid property interest, a substantive due process claim cannot succeed. *Vermont Assembly of Home Health Agencies, Inc. v. Shalala* (D.Vt.1998), 18 F.Supp.2d 355, 368. Therefore, we affirm the trial court's decision that ODJFS is entitled to judgment as a matter of law on MVCC–Fulton's substantive due process claims as well as on its procedural due process claims.

■  {¶ 36}  We also come to the same conclusion as the trial court with respect to the lack of timeliness by MVCC–Fulton in applying for relief for fiscal 1998. The plain language contained in Ohio Adm.Code 5101:3–3–24(D)(1), as quoted above, requires that MVCC–Fulton should have sought relief for fiscal 1998 on or before June 30, 1998. There is no factual dispute that the initial request for rate reconsideration due to extreme hardship was dated December 29, 1998. Consequently, the request was timely only as to fiscal 1999. The interpretation of statutes and administrative rules should follow the principle that neither is to be construed in any way other than as the words demand. *Clark v. State Bd. of Registration for Professional Engineers & Surveyors* (1997), 121 Ohio App.3d 278, 284, 699 N.E.2d 968. Because we find the regulatory language that limits the date by which an application for rate reconsideration due to extreme hardship must be filed to be clear and unambiguous, we must apply the regulation as written. *Symmes Twp. Bd. of Trustees v. Smyth* (2000), 87 Ohio St.3d 549, 553, 721 N.E.2d 1057; *State v. Gillman* (Dec. 13, 2001), Franklin App. No. 01AP–662, 2001 WL 1586688, and *Charvat v. Dispatch Consumer Serv., Inc.*

(Aug. 22, 2000), Franklin App. No. 99AP–1368, 2000 WL 1180258, reversed in 95 Ohio St.3d 505, 2002-Ohio-2838, 769 N.E.2d 829.

{¶ 37} The argument by MVCC–Fulton that another rule vesting the department with discretion to determine the effective date of any rate adjustment granted due to extreme hardship excuses a provider from seeking relief in timely fashion, is not well taken. If the application is not timely filed, it ought not be granted. The other rule that provides for discretion in determining the effective date for relief, if granted, does not apply if an application is denied as untimely. The conclusion by the trial court that ODJFS is entitled to judgment as a matter of law on the claims of MVCC–Fulton that pertain to fiscal 1998 is affirmed.

{¶ 38} As to MVCC–Fulton's R.C. Chapter 5111 claims for an adjustment of the rate paid to it during fiscal 1999, ODJFS, the party moving for summary judgment, bears the initial responsibility to inform the court of the basis for its motion and to identify those portions of the record that demonstrate the absence of a genuine issue of fact as to a material element of one or more of the nonmoving party's claims for relief. *Christensen v. Ohio Mulch Supply, Inc.* (Aug. 14, 2001), Franklin App. No. 00AP–1036, 2001 WL 910110, and *Al–Najjar,* supra, citing *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292, 662 N.E.2d 264.

{¶ 39} If ODJFS satisfies this initial burden by presenting or identifying appropriate Civ.R. 56(C) evidence, MVCC–Fulton must then present similarly qualified evidence in rebuttal sufficient to establish that genuine issues of material fact must be preserved for trial. Id., citing *Norris v. Ohio Std. Oil Co.* (1982), 70 Ohio St.2d 1, 2, 24 O.O.3d 1, 433 N.E.2d 615. The nonmoving party does not need to try its case at this juncture, but it must produce more than a scintilla of evidence in furtherance of its claims. *McBroom v. Columbia Gas of Ohio, Inc.* (June 28, 2001), Franklin App. No. 00AP–1110, 2001 WL 721949. MVCC–Fulton may not merely rely on the allegations in its pleadings or simply restate and reargue those allegations in order to avoid summary judgment. *Swedlow, Butler, Inman, Levine & Lewis Co., L.P.A. v. Gabelman* (July 14, 1998), Franklin App. No. 97APG12–1578, 1998 WL 400743.

{¶ 40} To decide whether ODJFS is entitled to summary judgment on the claims of MVCC–Fulton that the department failed to comply with the requirements of R.C. 5111.01 et seq. and Ohio Adm.Code 5101:3–3 et seq., we must examine the evidence properly presented by the parties in support of and in opposition to the motion for summary judgment. We must consider that evidence in a light most favorable to MVCC–Fulton, the nonmoving party. *Ryberg,* supra. MVCC–Fulton relies specifically on the provisions of R.C. 5111.21(A) and 5111.29(A)(3) and Ohio Adm.Code 5101:3–3–24(D) in arguing that a genuine issue of material fact remains as to whether ODJFS abused its discretion when it granted a rate adjustment in an aggregate amount less than what MVCC–Fulton

contended was necessary to fully reimburse the reasonable costs it alleged were and would be incurred between July 1, 1998 and June 30, 1999.

{¶ 41} Reviewing the Civ.R. 56(C) evidence presented by ODJFS in the light required, we conclude that the department satisfies its initial burden. The affidavit of Charlene Murphy, Technical Analysis Manager of the Reimbursement Section of the Bureau of Long Term Care Facilities, explains in detail the procedure followed by the department in reviewing the request by MVCC–Fulton for a rate adjustment grounded upon extreme hardship. Murphy identifies and qualifies as appropriate under Civ.R. 56(C) documents, which are attached to and incorporated in her affidavit and which the department considered, including information furnished by the applicant and reports generated by ODJFS. The evidence offered shows a thorough, comprehensive consideration of MVCC–Fulton's request for relief due to extreme hardship. Upon that evidence, absent additional evidence from MVCC–Fulton to rebut it, a conclusion that ODJFS is entitled to summary judgment as a matter of law would be proper. The burden, therefore, shifts to MVCC–Fulton to establish otherwise.

{¶ 42} In opposition to the motion for summary judgment, MVCC–Fulton provides an affidavit by Bert Cummins, C.P.A., and a properly authenticated copy of correspondence from the former director of ODMRDD in support of the application for rate adjustment due to extreme hardship. MVCC–Fulton also relies upon the depositions, with exhibits, of a number of witnesses, the transcripts of which were filed in the trial court record.

{¶ 43} Based upon his experience and his review of the documentation submitted to and considered by ODJFS, the analysis reports created by ODJFS personnel, and the transcripts of deposition testimony by ODJFS employees, Cummins concludes:

{¶ 44} "The result of the Department of Job & Family Services rate reconsideration review (to grant the minimal relief provided to Morning View Care Center) is completely unsupported by any of the data and analysis set forth in its letter to the provider stating its decision, the attachments to that correspondence and any of the other documents prepared by the Department." Cummins Affidavit, paragraph 11.

{¶ 45} Cummins identifies several specific examples of ODJFS having abused its discretion, including an attempt to calculate an overpayment related to renovations, an audit function, and factor that calculation into the amount of capital relief granted. The witness opines that this calculation is "an abuse" and inappropriate within the context of the rate reconsideration process for determining a rate adjustment based upon extreme hardship. (Cummins Deposition, at 91.) He also questions the department's emphasis on "MVCC–Fulton's failure to prepare a transition plan and adequately assess the downsizing feasibility"

(January 10, 2001 Depositions Ex. 4, at 14), explaining that the concept of adequate planning is undefined and presents the provider with a "moving target if there's a target at all." (Cummins Deposition, at 76.)

{¶ 46} Steven Stanisa, also a C.P.A. and a consultant to the long-term care industry, was deposed as a prospective expert witness on behalf of MVCC–Fulton. His testimony includes his opinion that "the department inappropriately exercised its discretion" in relation to its approval of the hardship request and "failed to reimburse the reasonable cost of the provider" in caring for its residents. (Stanisa deposition, at 15.) The witness identifies the $12.48 per-patient per-day rate adjustment approved as an abuse of discretion inasmuch as he does not believe it to be based upon the costs detailed in the required three-month cost report that accompanied the application. (Stanisa deposition, at 50–51.)

{¶ 47} We recognize that generally a reviewing court will not intrude into areas of administrative discretion for the reason that a rebuttable presumption of validity attaches to actions of administrative agencies. *Ohio Academy of Nursing Homes, Inc. v. Barry*, supra, 56 Ohio St.3d at 129, 564 N.E.2d 686; and *Ohio Academy of Nursing Homes, Inc. v. Creasy*, supra, 1983 WL 3652, quoting *Country Club Home, Inc. v. Harder* (1980), 228 Kan. 756, 763 and 771, 620 P.2d 1140. State agencies and their personnel, acting pursuant to a grant or delegation of authority from the legislature, enjoy reasonable latitude with respect to decisions made within their administrative domain. *Ohio State Pharmaceutical Assn. v. Creasy* (S.D.Ohio 1984), 587 F.Supp. 698, 704. An agency's interpretation of a statute that governs its actions should be given deference so long as the interpretation is not irrational, unreasonable, or inconsistent with the statutory purpose. *Ellis Ctr. for Long Term Care v. DeBuono* (1998), 175 Misc.2d 443, 448, 669 N.Y.S.2d 782. Similar deference should be given an agency's interpretation of the rules and regulations it is required to administer, unless that interpretation is unreasonable or conflicts with a statute covering the same subject. *State ex rel. Celebrezze v. Natl. Lime & Stone Co.* (1994), 68 Ohio St.3d 377, 382, 627 N.E.2d 538.

{¶ 48} The agency's interpretation and application of its rules cannot be arbitrary, capricious or otherwise contrary to law, nor can the interpretation and application constitute an abuse of discretion. See *Ohio Academy of Nursing Homes, Inc. v. Barry*, supra, 56 Ohio St.3d at 129, 564 N.E.2d 686. The agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Assn. of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.* (1983), 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443, quoting *Burlington Truck Lines, Inc. v. United States* (1962), 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207.

A judicial review of that explanation must inquire whether the decision is based upon relevant factors and whether there has been a clear error in judgment on the agency's part. Id. Among the indicia that agency action is arbitrary and capricious are (1) that the agency has relied on factors the legislature did not intend it to consider; (2) that the agency failed to consider an important aspect of the problem; (3) that the agency's explanation of its decision is contrary to the evidence before it; or (4) that the agency's action is implausible to an extent that it cannot be attributed to agency expertise. Id.

{¶ 49} Here, the department's announcement of its decision included the following explanation:

{¶ 50} "In order for ODHS to grant a rate adjustment as a result of a request for rate reconsideration due to extreme hardship, a provider should clearly demonstrate the following:

{¶ 51} "The financial hardship is the result of factors outside the provider's control[.]

{¶ 52} "The PPS [Prospective Payment System] is failing to respond appropriately to the circumstances presented.

{¶ 53} "MVCC–Fulton's failure to prepare a transition plan and adequately assess the downsizing feasibility is neither outside the provider's control nor a failure of the PPS. As such, the failure to effectively plan and analyze the proposed downsizing cannot serve as the basis for relief due to extreme hardship.

{¶ 54} "The basic principles underlying the provisions of OAC Rule 5101:3–3–24(D) was to respond to situations where a provider could not reasonably control and/or the PPS was not responding appropriately. These provisions were in no way intended to protect the operator of a long-term care facility from the risks and responsibilities of operating a business venture. * * *

{¶ 55} "MVCC–Fulton did not fully demonstrate which circumstances either were outside their control, a failure in the PPS, or documented all the cost reduction steps implemented by the provider, along with the associated cost savings with these steps. * * *" January 10, 2001 Depositions Ex. 4, at 14.

{¶ 56} The deposition testimony of Barbara Edwards and Harry Saxe is evidence of the extent to which ODJFS focused on the issue whether a mandate, either by direct order or statewide policy, was in effect that required MVCC–Fulton to downsize its primary facility. Susie Weber and Charlene Murphy acknowledged in their deposition testimony that, according to their respective understandings, the department rules do not require submission of transition plans in connection with an extreme hardship application. Also, in her second deposition, Charlene Murphy admitted that the department had not, to her knowledge, previously adjusted the number of patient days from a prior year that

used to calculate a provider's current rate of reimbursement in the context of ruling upon a request for that rate to be adjusted due to downsizing.

{¶ 57}  In the course of completing the required de novo review of the trial court's judgment, we have considered a significant volume of evidence presented in support of and in opposition to the motion for summary judgment.  We conclude from that evidence, viewing it, as we must, most favorably to the nonmoving party, that MVCC–Fulton has sustained its burden to establish the existence of genuine issues of material fact concerning whether ODJFS complied with the requirements of R.C. 5111.01 et seq. and Ohio Adm.Code 5101:3–3 et seq., in granting limited relief in response to the application expressly grounded in extreme hardship under R.C. 5111.29(A)(3) and Ohio Adm.Code 5101:3–3–24(D) for fiscal 1999.

{¶ 58}  Even though the discretion vested in ODJFS by R.C. 5111.29(A)(3) is broad, it is neither unlimited, nor "unequivocal"[8] as the trial court has characterized it.  The use by the agency of that discretion cannot amount to an abuse of discretion or otherwise not be in accordance with the law, including applicable regulations.  *Ohio Academy of Nursing Homes, Inc. v. Barry,* supra, 56 Ohio St.3d at 129, 564 N.E.2d 686.  We find that the evidence produced by MVCC–Fulton, particularly testimony by Bert Cummins and Steven Stanisa, is sufficient to establish a genuine issue of fact as to whether ODJFS abused its discretion in determining the amount of the rate adjustment granted to MVCC–Fulton.

{¶ 59}  The explanation by ODJFS of its actions, together with deposition testimony describing some of the areas of agency focus in its analysis, is evidence that the department applied standards not applicable to the grounds upon which relief was requested.  A decision to grant or deny relief requested under extreme hardship provisions should be reached according to the regulations governing that type of relief.  To the extent that the agency emphasized issues pertaining to extreme circumstances, governed by Ohio Adm.Code 5101:3–3–24(C), and government mandate, addressed by Ohio Adm.Code 5101:3–3–241, a genuine issue of material fact exists as to whether it reasonably applied its own regulations.  Relief for extreme circumstances is appropriate upon a showing that the circumstances are beyond a provider's control.  Applicable rate ceilings limit relief for extreme circumstances.  By contrast, ineligibility for extreme circumstances relief is a prerequisite to seeking alternative relief for extreme hardship, and a provider seeking relief due to extreme hardship has an opportunity to justify a

---

8.  "Unequivocal" is defined in Webster's Encyclopedic Unabridged Dictionary of the English Language (1996) 1548, as (1) not equivocal, unambiguous, clear, having only one possible meaning;  (2) explicit, definite, not merely implied or suggested;  (3) absolute, unqualified, not subject to conditions or exceptions;  (4) conclusive, unquestionable, not subject to dispute or challenge.

rate adjustment in excess of applicable ceilings. The use of these extreme circumstances standards to determine entitlement to relief for extreme hardship is contrary to the express provisions of Ohio Adm.Code 5101:3–3–24(C) and disregards the distinction drawn by the legislature when it enacted R.C. 5111.29(A)(3) separate from R.C. 5111.29(A)(2).

{¶ 60} ODJFS has argued, and the trial court found, that the decision by this court in *Ohio Academy of Nursing Homes, Inc. v. Creasy,* supra, 1983 WL 3652, defines reasonable costs in the rate-setting context as being limited to only those costs that do not exceed the ceilings applicable to various cost centers. While we did find such ceilings to be reasonable in that case and to generally be an appropriate methodology for defining reasonable costs in a prospective cost-related system of reimbursement, we were deciding issues dissimilar to those presented here. We held that "it is not per se unreasonable that all nursing homes be reimbursed for specific cost centered ceilings based upon costs which ninety percent of the nursing homes incur * * *." Id.

{¶ 61} In this case, where the issues to be decided require a showing of extreme hardship and a determination whether the existing rate under the prospective payment system responds reasonably to an increase in costs related to the hardship, the correct measure of "reasonable" costs is that provided by the legislature in R.C. 5111.20(U), as quoted above. Because Ohio Adm.Code 5101:3–3–24(D)(4) contemplates occasions where justification for a rate adjustment beyond the ceilings may be shown, a genuine issue of material fact also exists as to whether ODJFS correctly calculated the "reasonable costs of services provided" consistent with R.C. 5111.21(A).

{¶ 62} MVCC–Fulton is not necessarily entitled to an adjusted rate equal to its total request. ODJFS would have ignored its responsibility to determine what is reasonable had it simply paid the amount requested. *Worthington Nursing Home, Inc. v. Creasy,* supra, 4 Ohio App.3d at 97, 4 OBR 174, 446 N.E.2d 841. As we noted in that case, there is no presumption that all costs expended not in excess of fixed ceilings are reasonable. Id. Similarly, where in relation to extreme hardship rate reconsideration requests, a provider has the opportunity to show its increased costs to be reasonable and necessary even though they have risen above the applicable ceilings, ODJFS must determine what is reasonable independent of the ceilings. In such an instance, we view the ceilings to be evidence of what is reasonable, but not determinative in every case without regard to the circumstances presented by the provider.

{¶ 63} Because we conclude that ODJFS is not entitled to judgment as a matter of law on the claims of MVCC–Fulton under state law that the department failed to comply with the requirements of R.C. 5111.01 et seq. and Ohio Adm.Code 5101:3–3 et seq., we sustain the single assignment of error in respect

to those state claims. However, we affirm the trial court's judgment that ODJFS, as an agency, is not a "person" subject to suit under Section 1983, Title 42, U.S.Code, that ODJFS is entitled to judgment as a matter of law on MVCC–Fulton's due process claims, and that ODJFS is entitled to judgment as a matter of law on the claims of MVCC–Fulton that pertain to fiscal 1998. Accordingly, the assignment of error is sustained in part and overruled in part, and the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part. This cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.

Judgment affirmed in part,
reversed in part
and cause remanded.

TYACK, P.J., and LAZARUS, J., concur.